## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BROOK R. GRASSMYER, PATRICIA A. | ) |
| McGRANE, and LYNN A. RYAN | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 07-98 |
| | ) |
| SHRED-IT USA, INC., | ) |
| | ) Judge Kim R. Gibson |
| Defendant. | ) |

## OPINION AND ORDER OF COURT

Now before the Court is Defendant Shred-It USA's ("Shred-It") motions for summary judgement as to the claims of Plaintiffs Brook Grassmyer, Patricia McGrane and Lynn Ryan (Doc. No. 36, 40, 44). After careful consideration of each motion, the briefs in support and opposition, the concise statements of material facts and appendices thereto, this Court will grant Defendant's motions for summary judgment.

## FACTUAL BACKGROUND

The following facts are undisputed unless stated otherwise.

Defendant Shred-It provides secure and confidential document destruction services for its customers. Shred-It employs sales representatives to sell its services to its customers. Doc. No. 38, ¶ 1 (hereinafter as "Def.SOF-A"). Shred-It employed Mmes. Brook Grassmyer, Patricia McGrane and Lynn Ryan as sales representatives in western Pennsylvania. Def.SOF-A, ¶ 2. Shred-It employed Ms. Grassmyer from May 23, 2005 until she voluntarily resigned on January 25, 2006. Shred-It employed Ms. McGrane from May 2, 2005 until September 9, 2005 when she was terminated for failing to meet sales quotas. Shred-It employed Ms. Ryan from February 1, 2005 until January 13,

1

2006 when she was terminated for failing to meet sales quotas.

Among other duties, Shred-It sales representatives sell Shred-It's services, develop and maintain clients, develop their territory and targeting prospects, and attempt to meet sales quotas Def.SOF-A, ¶ 3. Sales representatives must meet certain sales quotas on a weekly and monthly basis. Def.SOF-A, ¶ 4. The sales quotas were well known to sales representatives since they are self-reported and are included in the job description for sales representatives. Def.SOF-A, ¶ 7. Over the past five years, Shred-It employed thirty-six different sales representatives in the Pittsburgh location. Twenty-three of these representatives were men, while thirteen were women. Eleven of the thirty-six representatives were fired for failing to meet sales requirements. Seven male representatives and four female representatives were fired. Def.SOF-A, ¶ 27. Former employees described employment at Shred-It as a "revolving door."

Shred-It representatives were required to achieve ten appointments per week, ten new automatic clients per week, $1190 per month in new auto revenue, 50 cold calls per week, 150 teleprospecting calls per week, five referrals per week and five client care calls per week. Def.SOF-A, ¶ 4. However, during a new representative's "ramp up" period, sales quotas were not the same. Laspina Dep., p. 30:1-4. A new representative was expected to sell one new automatic sales account ("auto") in her first month, two or three in their second month, and four to six in their third month. *Id.* at 8:14. New auto revenue sales were the key business indicator and standard of success at Shred-It. Doc. No. 53, ¶ 9 (hereinafter"Pls' SOF").

## *Facts Pertaining to Plaintiffs' Performance*

Ms. Grassmyer stated the sales quotas required of her were "ambitious." Def.SOF-A, ¶ 6. She also acknowledged that her sales performance, in relation to the quotas, needed improvement.

2

Def.SOF-A, ¶ 8. In her nine months of employment, she never met the following goals: revenue, 20 clients calls per month, or 40 appointments per month. Def.SOF-A, ¶ 9. While Ms. Grassmyer met teleprospecting and cold call quotas, these activities did not produce much in the way of sales. Def.SOF-A, ¶ 10. Ms. Grassmyer stated that making sales was the most important part of her job and that it is reasonable for Shred-It to enforce its quotas. Def.SOF-A, ¶ 11. Ms. Grassmyer was aware that she did not meet the requirements for new revenue, and that Shred-It expected her to show improvement. Def.SOF-A, ¶ 13. After her performance evaluation, Ms. Grassmyer received daily feedback from supervisor Dave Vaniel. Def.SOF-A, ¶ 14.

On January 25, 2006, Ms. Grassmyer voluntarily resigned from her position at Shred-It. Def.SOF-A, ¶ 15. Ms. Grassmyer stated that her working conditions were intolerable and that she had no choice other than to quit. The conditions she cited for her constructive discharge were that Shred-It advertised a position on a website that covered her territory, and that she received emails sent to all sales representatives that were negative and aggressive, and that co-plaintiff Ms. McGrane had been terminated recently. *Id* ¶ 17. Ms. Grassmyer stated that sales territories change frequently, and that Shred-It was always looking to hire new sales representatives due to a large turn-over; she further explained that she was never told that she was being terminated or replaced. *Id.* ¶18. Ms. Grassmyer acknowledged that the emails were not negative or aggressive in terms of gender discrimination, and that the emails were sent to all sales representatives both male and female. *Id.* ¶ 19. The emails focused on increasing sales performance and exhibited a tone of "shape up or ship out." *Id.* Ms. Grassmyer stated that the emails did not show any gender discrimination, except for the use of the word "team"; she felt this term indicated a male connotation. *Id.* ¶ 21. Ms. Grassmyer further stated that she knew of a male employee, Dave Peters ("Peters"), that was terminated for poor

3

sales performance. Def.SOF-A, ¶ 22.

Ms. Grassmyer stated that she did not contemplate leaving Shred-It until she saw the job posting on the internet on January 20, 2006. Def.SOF-A, ¶ 23. Ms. Grassmyer contacted a prospective employer on December 30, 2005 and interviewed with that company on January 5, 2006. Def.SOF-A, ¶ 24. She also contacted Laurel Medical Supplies about employment two weeks before the termination of Ms. McGrane's employment, and three weeks before Ms. Grassmyer noticed Shred-It's job posting on the internet. Def.SOF-A, ¶25. After departing Shred-It, Ms. Grassmyer accepted a position with Laurel Medical Supplies, which paid a higher salary. Def.SOF-A, ¶ 26.

Shred-It employed Ms. Ryan as a sales representative from May 2, 2005 until September 9, 2005, when she was terminated for failing to meet sales quotas. Doc. No. 42,  ¶2 (hereinafter "Def.SOF-B"). Ms. Ryan stated that during her time at Shred-It, her performance was "up and down." *Id.* ¶ 7. On July 19, 2005, Ms. Ryan received a written warning indicating that she needed to improve on her performance, specifically selling accounts, meeting revenue goals, scheduling appointments and attending company meetings. *Id.* ¶ 10. Ms. Ryan's three month evaluation also indicated that she was not meeting many of her sales quotas. *Id.* ¶ 11. While Ms. Ryan denied receiving the performance evaluation, she acknowledged being required to self-report her results and also acknowledged her awareness of her performance deficiencies. *Id.* ¶ 12.

Shred-It employed Ms. McGrane as a sales representative from February 1, 2005 until January 13, 2006, when she was terminated for failing to meet sales quotas. Doc. No. 46, ¶ 2 (hereinafter as "Def.SOF-C"). Ms. McGrane stated that she was not meeting her performance requirements at Shred-It. *Id.* ¶ 7. On September 9, 2005, Shred-It reviewed Ms. McGrane's performance, and informed her that she was not meeting her sales quotas. *Id.* ¶ 9. Specifically, she

4

did not meet five of the twelve areas in the evaluation. *Id.* ¶ 10. Ms. McGrane signed and acknowledged the evaluation. *Id.* Ms. McGrane met with Shred-It General Manager Gino Laspina on December 20, 2005. *Id.* ¶ 11. Ms. McGrane received another written warning on January 9, 2006 stating that if she did not meet her sales quotas by January 13, 2006, she would be terminated. *Id.* ¶ 12. Ms. McGrane did not meet her sales quotas by January 13, 2006, and was terminated on that date. *Id.* ¶ 13.

## *Facts Pertaining to Training*

Former male sales representatives stated that they received the same video and online training that plaintiffs received. Def.SOF-B, ¶ 20. At least once, Mr. Laspina rode with each salesperson to provide training and instruction to new sales representatives. Pls' SOF, ¶ 29. The purpose of "ride-alongs" was to address issues with sales representatives if they were having problems, and give them advice. Pls' SOF, ¶ 44. Ms. McGrane testified that on numerous occasions, Sales Representative Supervisor Kevin Mitchell told her that he would go on "ride-alongs" with her; however, he generally failed to show up. Pls' SOF, ¶ 49. Ms. Ryan testified that Mr. Mitchell missed or canceled "ride-alongs" with her as well. Def.SOF-B, ¶ 22. Ms. Grassmyer stated that Sales Representative Supervisor David Vaniel failed to provide her directions when she asked for assistance. Pls' SOF, ¶ 48. Ms. Ryan felt that she had been treated unfairly by Mitchell, because he did not provide necessary supervision, training and mentoring. Pls' SOF, ¶ 44. Sales Representatives Larry Bowser, Nick Pavlecic, and Mr. Peters did not recall having scheduling problems with Mitchell. Pls' SOF, ¶¶ 35-37. Sales Representative Jack Papson testified that he also encountered that Mitchell would be late for "ride-alongs" although he could not remember any specific instances. Papson Dep., p. 11:1-5.

5

*Facts Pertaining to Enforcement of Quotas*

Mr. Peters stated that after receiving a performance warning, he was terminated. Def.SOF-A, ¶ 28. Mr. Pavelecic stated he did not remember being on a performance action plan; however, he stated that based on his numbers, he should have been. Pls' SOF, ¶ 56. Sales Representative Jack Papson stated that he was aware that his sales were lacking and that he was warned, although he did not recall receiving three warnings. *Id.* ¶ 59. Mr. Papson stated that he left Shred-It because of financial reasons unrelated to the warnings. *Id.* ¶ 60. Sales Manager Dave Vaniel stated that he did schedule a check-point review of Ms. McGrane while she was on vacation, and that he could not remember placing any other sales representatives on an action plan over a holiday. *Id.* ¶ 69. Ms. McGrane stated that Mr. Peters was given more time to meet his goals, and that Mr. Bowser did not have any appointments for his first seven weeks after he was hired. *Id.* ¶ 74. Ms. McGrane stated that prior to her action plan, she had not spoken with Mr. Laspina about her performance; she further claims to have never received a second warning prior to her third and final warning given to her on January 9, 2006. *Id.* ¶¶ 77-78.

*Facts Pertaining to Assignment of Territories*

Mr. Laspina was responsible for making territory assignments and allocations. *Id.* ¶ 4. Ms. McGrane stated that she complained to the human resources department about another sales representative, Dennis Milavic, being given part of her territory. *Id.* ¶ 25. Mr. Vaniel stated that the company reallocated Ms. McGrane's territory for logistical purposes. *Id.* ¶ 21. All of the Plaintiffs claim that they did not know that they could have applied for territory openings while they were employed with Shred-It. *Id.* ¶ 28. Mr. Milavic stated that he felt that someone was being wedged out when he was brought onto the new territory, and that this allocation was being kept quiet, which

6

made him uncomfortable. Milavic Dep., p. 29:10-25. Mr. Laspina stated that the reason he assigned Mr. Milavic part of Ms. McGrane's territory was she was not generating any new business from that area and he felt that there was tremendous opportunity for income from that market that had not yet been generated. Laspina Dep., p. 49:7-13.

### *Facts Pertaining to the Hostile Work Environment Claim*

Ms. McGrane stated that a hostile work environment was created by the use of vulgar language by Mssrs. Vaniel and Mitchell. Def.SOF-C, ¶ 25. Specifically, Ms. Pavelecic stated that Mr. Mitchell was pretty free with his language, and that the guys in the office would joke around a lot. Pls' SOF, ¶ 90. Mr. Mitchell regularly used profanity in the office and made sexually explicit and inappropriate comments. *Id.* ¶ 93. Some of the employees complained that Mr. Mitchell made sexually explicit comments, include his discussion of sexual relationships, the size of his genitalia, making crude jokes, discussing his drinking, stating that Ms. Laspina enjoyed going to strip clubs, and playing a sexually explicit song on his computer in the office. *Id.* ¶¶ 94, 97. Ms. Ryan stated that Mr. Mitchell regularly referred to women as "bitches"; furthermore, Ms. McGrane and she complained about Mr. Mitchell, and had left the room because of his presence. *Id.* ¶ 95. Ms. McGrane stated that another Shred-It employee told her that Mr. Mitchell wanted her fired. *Id.* ¶ 100.

Ms. McGrane worked with Mr. Mitchell for eight months, until he left Shred-It on October 13, 2005. Def. SOF-C, ¶ 27. Ms. McGrane complained about Mitchell's conduct on January 9, 2006 by phone and again on January 11, 2006 by e-mail. *Id.* ¶ 28. Thus, Ms. McGrane made her complaint approximately three months after Mr. Mitchell left Shred-It. *Id.* ¶ 29. Ms. McGrane had not previously complained about discrimination or harassment before January 9, 2006, when she received her final performance warning. *Id.* ¶ 30.

## SUMMARY JUDGMENT STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). However, the Court must examine the facts in the light most favorable to the non-moving party opposing the motion. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255 (1986)).

## ANALYSIS

### 1. Gender Discrimination

Mmes. Grassmyer, McGrane and Ryan all claim that Shred-it discriminated against them, on the basis of gender, in the following areas: the amount of assistance provided to perform their jobs successfully, the allocation of territories and the enforcement of sales quotas. Furthermore, the

8

Plaintiffs additionally allege that the Shred-It exhibited the atmosphere of a "men's club."

To make a claim under Title VII where circumstantial evidence is sought to prove gender discrimination, the Plaintiffs must satisfy the three-step burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The first step requires Plaintiffs to establish a *prima facie* case of discrimination that raises an inference of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once Plaintiffs establish a *prima facie* case the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n.5 (3d Cir. 1998). After a legitimate, non-discriminatory reason has been offered "the *McDonnell Douglass* framework–with its presumptions and burdens–disappear[s], and the remaining issue [i]s discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). Therefore, Plaintiffs ultimately must show by a preponderance of the evidence that the reason given by the employer is not the true reason but is a pretext for discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

In a discharge case, such as this, the *prima facie* elements are (1) plaintiffs are members of the protected class; (2) they were qualified for the position; (3) they were discharged; and (4) similarly situated employees who are not members of the protected class were treated more favorably. *Jones*, 198 F.3d at 411; *Goosby v. Johnson & Johnson Med. Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000). Shred-It challenges the Plaintiffs' ability to establish a *prima facie* case with respect to whether they were qualified for the position, and whether similarly situated employees, who are not members of the protected class, were treated more favorably. As to Ms. Grassmyer, Shred-It challenges her ability to show that she was constructively discharged.

9

The bar is set low for establishing the elements of a *prima facie* case of employment discrimination. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006)(citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1993)). Furthermore, the *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experiences as it bears on the critical question of discrimination." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990). To that end, disputes over subjective qualifications have been recognized as the kind of disputes best left to the second and third steps of the *McDonnell Douglas* analysis, so to "avoid putting too onerous a burden on the plaintiff in establishing a *prima facie* case." *Ezold*, 983 F.2d at 523 (citing *Fowle v. C & C Cola*, 868 F.2d 59, 64 (3d Cir.1989)).

Here, Shred-It seeks to show that the Plaintiffs were not qualified for their positions because of their failure to meet the objective sales quotas. Obviously, sales requirements offer objective criteria as to the Plaintiffs' job qualifications; however, in reviewing the performance agreement sheets of the employees of the defendant, it is apparent that some level of subjectivity is included in the employee evaluations. In particular, the performance agreement sheets occasionally specify that an employee "almost meets" a sales objective; this evaluation includes subjective criteria that is best left analyzed under the pretext step of the *McDonnell Douglas* framework. Since there is no dispute that the Plaintiffs were qualified to perform the position at the time they were hired, this element of the *prima facie* case has been met.

Next, Shred-It argues that Plaintiffs cannot meet the element of showing that similarly situated male employees were treated more favorably than females. Again, it should be remembered that the burden of establishing a *prima facie* case is not onerous. *Burdine*, 450 U.S. at 253. The

10

plaintiffs can establish the fourth element by showing either that the position was ultimately filled by an individual outside the protected class or by showing that similarly situated individuals outside the protected class were treated more favorably. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1066 n.5 (3d Cir 1996); *Ezold*, 983 F.2d at 522. Ms. Grassmyer's position was filled by a male. Vaniel Dep., p. 46:14-47:10. Ms. Ryan's territory was taken over by Mr. Bowser, and Ms. McGrane's territory was taken over by Mr. Milavec. Thus, Plaintiffs can establish that their respective positions were filled males. Consequently, Plaintiffs make out a *prima facie* case of gender discrimination, meaning that Shred-it must articulate a legitimate non-discriminatory reason for the plaintiffs' termination.[1]

Shred-It satisfies the burden of articulating a legitimate non-discriminatory reason by introducing "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993)). The defendant's burden is "relatively light." *Fuentes*, 32 F.3d at 763. However, the explanation provided must clearly set forth a legally sufficient reason to justify Plaintiffs' termination. *Burdine*, 450 U.S. at 255-56. In this matter, the record shows that Shred-It satisfies its burden in articulating that the Plaintiffs were terminated from their position due to failure to meet the sales quotas required of all sale representatives. Consequently, the burden oSeptember 4, 2009f production shifts to Plaintiffs to produce sufficient evidence of pretext. *Ezold*, 983 F.2d at 521.

In order to show that there is a triable issue of fact, Plaintiffs must "point to some evidence,

---

[1]Defendant also challenges plaintiff Ms. Grassmyer's ability to show that she was constructively discharged in order for her to establish her *prima facie* case. For purposes of this motion, the court will assume that Ms. Grassmyer can also establish a *prima facie* case, since none of the plaintiffs can otherwise establish pretext.

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. At this stage in the *McDonnell Douglas* framework, it is the Plaintiffs' burden to "demonstrate such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (alteration in original)(footnote omitted)(citing *Ezold*, 983 F.2d at 533).

Plaintiffs argue that the reason given by Shred-It is not worthy of belief, because Shred-It did not fire male employees who were also not meeting their sales quotas and the sales quotas were enforced more stringently against the females. Furthermore, Plaintiffs argue that sufficient evidence exists to show that Shred-It set the Plaintiffs up to fail, and that the work environment was essentially managed as a "men's club." The Court will address each of these arguments in turn.

As an example that the quotas were more stringently enforced against females, Plaintiffs point out that even though Mr. Bowser failed to demonstrate any sales activity the first six weeks of his employment, he did not encounter any disciplinary actions. Plaintiffs contrast that leeway to Ms. Ryan's situation, as she was placed on a performance plan and threatened with dismissal within the first two months of starting. Furthermore, Plaintiffs also attempt to illustrate that their performance, albeit undisputedly below the sales quotas, was no worse than other male employees of the defendant. For instance, Plaintiffs aver that Mr. Bowser did not generate as much revenue for purge (one time only) customers as the three Plaintiffs, and that Mr. Bowser did not generate any revenue

12

for his first three months. Plaintiffs also highlight that Mr. Pavlecic averaged less auto revenue than Ms. Grassmyer.

Furthermore, Plaintiffs contend that anomalies in the performance action plans that they were placed upon may give rise to an inference of gender discrimination. As specific evidence of such anomalies, Plaintiffs aver that Ms. Ryan received an action plan during her "ramp-up" period, and Ms. McGrane was the only employee known to have been put on an action plan over the Christmas and New Years' holidays. Mmes. Grassmyer and Ryan also argue that they were never advised of their poor performance before they were placed on their action plan and shortly thereafter taken off the plan.

Despite these claimed inconsistencies in enforcement of the sales quotas, the Court simply cannot look past the significant evidence that Shred-It frequently terminated males for failure to meet sales goals. Plaintiffs acknowledge that during the relevant time period, Shred-It fired more males than females for failure to meet sales quotas. Although Plaintiffs point out that Mr. Bowser was not meeting his quotas in his first three months, Plaintiffs were not fired during their analogous "ramp up" period; furthermore, Plaintiffs do not present any evidence that any other employee was fired during that period. Also, when comparing Mr. Bowser's and Ms. Ryan's "ramp up" periods, Ms. Ryan achieved $188 in purge and $185 in auto revenue, while Mr. Bowser achieved $830 in purge and $0 in auto revenue. Additionally, the use of Mr. Bowser as a valid comparator becomes even more questionable as Mr. Peters was terminated under the same circumstances as Plaintiffs. In his last three months at Shred-It, Mr. Peters earned only $133 in auto revenue and $347 in purge revenue. Such numbers favorably compare to Plaintiffs' minimal numbers: Ms. Grassmyer earned $220 in auto revenue and $127 in purge revenue, Ms. McGrane earned $248 in auto revenue and

13

$2373 in purge revenue, and Ms. Ryan earned $0 in auto revenue and $572 in purge revenue. Doc. No. 54-4. 54-5. Mr. Peters performed nearly as poorly as Plaintiffs did, and, like Plaintiffs, was fired for this poor performance.

Pretext cannot be established by merely pointing to "a single member of a non-protected group [that] was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." *Kay Jewelers*, 142 F.3d at 646. Shred-It presents evidence that it fired male employees for the failure to meet sales quotas just as consistently and frequently as it fired female employees for the same failure. Such evidence would prevent any rational trier of fact from conceivably finding that the Plaintiffs in this matter were terminated because of their gender. Even when reading all possible inferences in favor of the non-movant with respect to the alleged anomalies in enforcing the sales quotas, and other alleged inconsistencies, a reasonable factfinder simply could not determine that gender was the motivating or determinative factor in the termination of the Plaintiffs' employment.

Plaintiffs also seek to show that they were "set up to fail" by Shred-It's unlawful discrimination with respect to in territory allocations, provision of job training and support, and general androcentric environment. Plaintiffs' main argument with respect to the territory allocations is that they were denied the opportunity to work in preferred areas, such as downtown Pittsburgh. Whether downtown Pittsburgh was, in fact, an easier area to makes sales in remains a disputed question of fact, but one that the Court ultimately deems immaterial. Nonetheless, viewing the facts in the light most favorable to the Plaintiffs, the Court will accept that downtown Pittsburgh was a preferable area to serve. Plaintiffs point out that their territories were the largest geographically, which made it more difficult to meet the sales quotas. Plaintiffs also aver that a male employee,

14

Dana Stevens, was offered a preferable territory by Mr. Laspina, while none of the Plaintiffs was ever offered a better territory. However, it is undisputed that the Plaintiffs never requested to be moved to better territory, whether to downtown Pittsburgh or anywhere else. The simple fact that certain males were given certain areas, and certain females were given other areas does not exactly give rise to any type of cognizable inference that somehow Shred-It executed a systematic design to prevent females from succeeding. That Plaintiffs were not offered a better area is not enough to show that they were "set up to fail" or establish pretext. A reasonable factfinder simply could not find that Plaintiffs were denied access to territories in which they could meet their sales quotas, particularly because the Plaintiffs never even bothered to request to be placed in a better territory.

Plaintiffs also raise the argument that a portion of Ms. McGrane's territory was given to Mr. Milavec, allegedly to "wedge out" Ms. McGrane. Plaintiffs claim that Shred-It offered inconsistent reasons for why Mr. Milavec was given a portion of Ms. McGrane's territory, in that Mr. Vaniel stated that the redistribution occurred pursuant to logistic reasons, while Mr. Laspina stated it occurred because Ms. McGrane did not develop the territory to its potential. Importantly, Plaintiffs do not dispute that the territories of the sales representatives changed while they were there. Indeed, Ms. Grassmyer's assigned territory actually became larger over the period of time in which she was employed. Grassmyer Dep., p. 11:5-11.

Additionally, Plaintiffs argue that they were "set up to fail" by being denied assistance and "ride-alongs" that Shred-It provided to other male employees. The Third Circuit recognized that "when an employer discriminatorily denies training and support, the employer may not then disfavor the plaintiff because her performance is affected by the lack of opportunity." *Ezold*, 983 F.2d at 540.

15

Plaintiffs argue that they encountered greater difficulty than male employees in receiving "ride-alongs" and assistance from Mssrs. Mitchell and Vaniel due to cancellations and unexplained unavailability. Specifically, Plaintiffs aver that Mr. Mitchell refused to attend or would limit the length of "ride-alongs." In particular, Ms. Ryan presents five occasions wherein Mr. Mitchell could not attend "ride-alongs" with her, due to his already being scheduled with Mr. Papson, family issues and being too hung over. Ryan Dep., p. 18:11-19:11. Ms. McGrane also testified that Mitchell was late or failed to attend "ride-alongs." McGrane Dep., p. 22:15-23:20. The record does indicates that Mr. Papson also encountered that Mr. Mitchell would be late for "ride-alongs" or have to reschedule although he gave no specific examples. Papson Dep., p. 11:1-5. Finally, Plaintiffs allege that Mr. Vaniel did not provide them with the same intensive training as that received by Mssrs. Bowser and Milavec.

Even if it is assumed, taking the facts in the light most favorable to the Plaintiffs, that they received less training and assistance than other male employees, Plaintiffs still present no evidence whatsoever that the cancellations by Mr. Mitchell or the lesser training from Mr. Vaniel occurred because of invidious gender discrimination; the existence of any discrimination is particularly questionable given that Mr. Papson encountered cancellations from Mr. Mitchell as well. Furthermore, Plaintiffs produce no evidence by which a factfinder could rationally conclude that the alleged deficiencies in training were intended to deny them the opportunity to succeed, let alone that the alleged denial was causally connected to their gender.

Plaintiffs lastly claim that pretext can be shown by the "men's club" mentality that existed. This allegation is based in part on the testimony of Mr. Milavec, who stated that he felt the office was more geared toward men and that the men do things as a group of guys. Milavec Dep., p. 27:11-

16

28-13. Plaintiffs point out that the male employees would socialize together without inviting them, which allegedly denied them an opportunity to build rapport with co-employees, and further limited their ability to perform in their positions. The Court finds that as a matter of law, this alleged male-oriented atmosphere is not sufficient evidence that would allow a reasonable factfinder to find that Shred-It's proffered reasons are pretextual. In considering all the record evidence as a whole, in the light most favorable to Plaintiffs, the offered rationales simply do not show such "weaknesses, implausibilities, inconsistences, incoherencies, or contradictions" in Shred-It's plausible rationale for firing Plaintiffs, meaning their continued failure to meet sales quotas. Furthermore, based upon the totality of the record, Plaintiffs simply do not establish even the possibility that, more likely than not, invidious discrimination existed at Shred-It in that management invidiously attempted to set Plaintiffs up to fail because of their gender.

Upon full consideration of all of the above, the Court concludes that no reasonable factfinder could find that gender discrimination was the cause of Plaintiffs' terminations. Furthermore, the Court finds that the resolution of any issues of fact would not enable a reasonable factfinder to find the existence of gender discrimination. Because there are not any material issues of fact, and Shred-It is entitled to judgment as a matter of law, this Court must grant summary judgment in Shred-It's favor as to Plaintiffs' discrimination claims.

## 2. Hostile Work Environment

The Court now turns to addressing Plaintiffs' hostile work environment claims. Mmes. McGrane and Ryan allege that they were subjected to a hostile work environment because of their gender. Title VII of the Civil Rights Act makes it unlawful for an employer to condone a sexually hostile work environment. 42 U.S.C. § 2000e-2(a)(1); *Meritor Savings Bank v. Vinson*, 477 U.S. 57

17

(1986). In order for an employer to be liable for condoning a sexually hostile work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990) (quoting *Vance v. S. Bell Tel. & Tel. Co.*, 86 F.2d 1503, 1510 (11th Cir.1989)). The Third Circuit set forth the following elements for a claim of sexual harassment: (1) the plaintiff suffered intentional discrimination because of her sex;" *Id.*, (2) the discrimination was "sufficiently severe or pervasive to alter the conditions of [their] employment;" *Penn. State Police v. Suders*, 542 U.S. 129, 133 (2004)(quoting *Meritor*, 477 U.S. at 67)(internal quotation marks omitted) "(3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews*, 895 F.2d at 1482.[2]

Shred-It argues that the complaints regarding Mr. Mitchell's statements and behavior are overstated, because the comments were neither sufficiently severe nor sufficiently pervasive to support a hostile work environment claim. Plaintiffs state that "the locker room talk, which Defendant correctly argues would not, standing alone, constitute a hostile work environment." Pls' Brief in Opposition, p. 4. However, Plaintiffs claim that the situation becomes actionable when taken in the context of facially neutral but gender-motivated mistreatment of Mmes. McGrane and Ryan. *See Durhan Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1996)("facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, [may] constitute[] [a]

---

[2]The Third Circuit recognized that the correct wording for the second element is "severe or pervasive" rather than often stated "pervasive and regular" phrasing. *Jenson v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006)(overruled on other grounds by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

hostile work environment.").

In support of their position, Plaintiffs point to the following unfavorable events: territory assignments, incidents of ridicule, Mr. Mitchell's expressed desire for Ms. Ryan to be fired, the reallocation of Ms. McGranes' territory, the anomalous action plan and checkpoint held over Christmas and New Years, and the discriminatory training and "ride alongs." Plaintiffs argue that these events, when combined with Mitchell's "locker room talk", constitute a hostile work environment based upon gender. As discussed in the previous section, a reasonable jury could not conclude that the mentioned "facially neutral mistreatment" was motivated by gender discrimination. Because the alleged "facially neutral mistreatment" was not gender discrimination, even considering it in addition to Mitchell's "locker room talk," which Plaintiffs concede on its own does not create a hostile work environment, cannot establish when combined "severe or pervasive" harassment. Even when evaluating all the incidents that Mmes. McGrane and Ryan alleged in their totality, this Court cannot conclude that the conduct was enough to "to alter the conditions of [their] employment." As a result, no trier of fact could find that Mmes. McGrane and Ryan were subjected to a hostile work environment, thus summary judgment must be granted for Shred-It.

## CONCLUSION

Since there are no genuine issues of material fact as to of Plaintiffs' gender discrimination and hostile work environment claims, and Defendant is entitled to judgment as a matter of law as to those claims, Defendant's motion for summary judgment is granted. An appropriate order follows.

19

AND NOW, this 4th day of September, 2009, for the reasons set for in the accompanying Opinion, it is HEREBY ORDERED that Shred-It USA's Motions for Summary Judgment (Doc. Nos. 36, 40, 44) are GRANTED.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

20